Filed 7/11/14  In re D.J. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.J., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E060278 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ120470) |
| v. | O P I N I O N |
| T.W., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, and Anna W. Wang, Deputy County Counsel, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

In this juvenile dependency proceeding, defendant T.W. (Mother) appeals from orders (1) denying her request to change court order pursuant to Welfare and Institutions Code section 388[1] (section 388 petition) and (2) terminating her parental rights with respect to her son, D.J.  Because we find no error, we will affirm the court's orders.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

A.  *Detention, Jurisdiction, Disposition (August 2010 – December 2010)*

In August 2010, Mother and her boyfriend were involved in a physical altercation resulting in injuries to Mother and the boyfriend's arrest.  Two-year-old D.J. saw the fight.  A referral was made to plaintiff, Riverside County Department of Public Social Services (DPSS), based upon allegations of general neglect and domestic violence.

In September 2010, a social worker interviewed Mother.  Mother lived in the home of D.J.'s paternal grandfather.  Mother reported that she had been diagnosed with bipolar disorder, received therapy once per week, and took a variety of prescription medications.  She told the social worker she began using drugs when she was 13 years old and had used "'off an[d] on' over the years . . . ."  (Mother was 34 years old at the time of the interview.)  Although she said she had been sober for the past two years, she admitted she had recently relapsed by using methamphetamine on two occasions.  On each occasion, D.J. was not with her and was under the care of another.  She denied using

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

drugs around D.J. or while caring for him. The social worker gave Mother a saliva test, which was negative for all substances. Mother agreed to a safety program and to participate in family maintenance services.

Mother promptly took steps to set up an intake appointment with family preservation court and was accepted into a substance abuse program.

About two weeks later, social workers went to Mother's home. Mother appeared to be under the influence of drugs. Mother said she relapsed and used drugs about one week prior. A saliva test indicated positive for methamphetamine. She denied using methamphetamine recently, and explained that she had been in a garage where other people were smoking methamphetamine. The social workers also noticed that Mother appeared to be unable or unwilling to redirect D.J. away from unsafe or inappropriate behavior. For example, Mother did not react when D.J. stood on a small chair to reach cough syrup on top of a television set. Based on these observations, the social workers took D.J. into protective custody.

Following a hearing, the court detained D.J. from the parents. Visits between Mother and D.J. were to take place at least two times per week. D.J. was placed in a foster home.

DPSS filed a petition under section 300, subdivisions (b) and (g), in October 2010. Under subdivision (b) (failure to protect), DPSS alleged: (1) Mother abused controlled substances, including methamphetamine, and supervised D.J. while under the influence; (2) Mother was offered family maintenance voluntary services but failed to benefit as she

3

continued to abuse methamphetamine; (3) D.J.'s father failed to maintain a relationship with D.J. and failed to provide the child with adequate food, clothing, shelter, medical treatment, and protection. Under subdivision (g) (no provision for support), DPSS alleged that D.J.'s father was incarcerated with an unknown release date and was unable to care for D.J.

Mother was admitted to MFI Recovery Center (MFI) on October 29, 2010. She agreed to participate in a parenting education program, random drug testing, a substance abuse program, a domestic violence program, 12-step meetings, and individual counseling.

In a jurisdictional/dispositional report, DPSS recommended that D.J. remain in foster care and the parents be given family reunification services. DPSS stated that the problems requiring its intervention included Mother's substance abuse, a history of domestic violence, and mental health issues, as well as father's long criminal history.

Regarding visits, DPSS reported that D.J. "always seems to be happy to see the [M]other during the visits" and the two "play together in the visitation room." The visits end without any reported incidents.

The court held the jurisdictional/dispositional hearing on December 1, 2010. DPSS changed its recommendation to provide that Mother retain physical custody of D.J. and that reunification services be denied to father. The court found true the allegations of the petition and declared D.J. a dependent of the court. In accord with DPSS's revised

4

recommendations, Mother retained physical custody of D.J. and was provided family maintenance services.

B.  *Family Maintenance Period (December 2010 – November 2011)*

In January 2011, Mother completed her inpatient program at MFI and returned to the home of the paternal grandfather.  D.J. was returned to her care in February.  Mother, D.J., and the paternal grandfather each have their own rooms inside the house.  A social worker described D.J. as an "independent child" who "has a close relationship with his [M]other and paternal grandfather."

In a report prepared for the six-month status review, the social worker reported that Mother was compliant with her case plan in most respects, but noncompliant as to drug testing.  She tested negative in February and March 2011, but tested positive for amphetamines on April 8, 2011, and was a "no show" for testing on April 28, 2011.  The social worker found Mother's failure "to actively participate in random drug testing" "disturbing."  DPSS recommended that Mother be given another six months of family maintenance services.  Following the six-month review hearing, D.J. continued to be placed in Mother's custody.

In November 2011, in a report prepared for a 12-month review hearing, DPSS recommended that D.J. continue to be placed with Mother, and that Mother be provided with another six months of family maintenance services.  The social worker again reported that Mother was compliant with all aspects of her case plan except drug testing.  During the reporting period, she tested positive for amphetamines on four occasions,

5

positive for marijuana once, was a "no show" once, and tested negative twice. The social worker concluded that Mother "appears not to have benefited from" her inpatient drug program.

On November 28, 2011, Mother attended a "Team Decision Meeting" at a DPSS office to address her "dirty drug tests and a safety plan" for D.J. Prior to the meeting, Mother took a saliva drug test, which indicated positive for methamphetamine. She explained that she used methamphetamine that morning. A "final decision" was made to remove D.J. from Mother and place him in foster care. D.J. was then taken into protective custody.

C. *Supplemental Petition (November – December 2011)*

On November 30, 2011, DPSS filed a supplemental petition under section 387. DPSS alleged that the previous disposition had not been effective because Mother continued to abuse controlled substances and failed to comply with her case plan.

At a detention hearing, the court detained D.J. and ordered him placed in DPSS custody. Visits were to be scheduled at least once per week.

On December 1, 2011, Mother told a social worker she continued to have a problem abusing controlled substances and alcohol. She said she was influenced by her friends who smoke methamphetamine and encouraged her to do the same. As for smoking methamphetamine on the day of the DPSS Team Decision Meeting, she explained that she "was not thinking" and "felt stressed." She said she understood that her continued substance abuse meant that D.J. could not "live with her at this time . . . ."

6

The paternal grandfather told the social worker that he was willing to provide a home for D.J. if Mother was able to get into a drug treatment program.

At a jurisdictional/dispositional hearing, the court found the allegation true and removed D.J. from Mother's custody. The court ordered that Mother be provided reunification services.

D. *Six-month Review Period (December 2011 – June 2012)*

In a status review report filed in June 2012, the social worker reported that Mother was admitted into "A Woman's Place" for treatment on February 8, 2012. She completed the inpatient substance abuse program on May 8, 2012, and all tests during the reporting period were negative. The social worker stated that Mother needed to complete an outpatient program and after care before D.J. could be returned to her home. DPSS recommended that Mother be provided with an additional six months of reunification services. The social worker stated that "if reunification should fail, the prospective plan would be adoption with the paternal grandfather . . . ."

At the six-month review hearing, the court ordered that D.J. continue to be placed in foster care and that Mother receive reunification services for six more months.

E. *Twelve-month Reporting Period (July 2012 – February 2013)*

In July 2012, Mother was arrested for shoplifting. In October and November 2012, she tested positive for amphetamines. Her drug counselor reported that Mother "is in denial about the severity of her addiction" and "is not serious about treatment as she

has missed her last appointment." The following month, the counselor reported that Mother's participation in the program had been terminated.

In a report prepared for a 12-month review hearing, the social worker stated: Mother "continues to use drugs and shoplifts on a regular basis. She has been given twenty-four months of services and has not benefited. She would place her young son at risk if he was in her care and the timelines for reunification have not only been exhausted but are at an end. [Mother] goes from program to program but has not made any life changes despite all the services and programs she has been offered and completed. It is concerning after all this time [Mother] places herself in the same situation over and over again, never learning from her triggers which cause her to use [drugs] regularly."

In a February 2013 addendum report, the social worker stated that Mother had enrolled in a "Dual Diagnosis Program" at Whiteside Manor and "may be at the facility from four to six months as she is learning to remain sober." The social worker commented that despite completing "several drug programs [Mother] appears not to have benefited from her previous services to help mitigate the circumstances which brought her to the attention of [DPSS]."

D.J. was having weekend visits with the paternal grandfather, to which he looked forward. DPSS decided to place D.J. in the paternal grandfather's care with the goal of adoption.

In February 2013, the court terminated Mother's reunification services based upon "clear and convincing evidence" that "[Mother] failed to participate regularly and make

8

substantive progress in the court-ordered Case Plan and there is no substantial probability of return if given additional services." The court then set a selection and implementation hearing to be held pursuant to section 366.26.

F. *Permanency Planning Period (February 2013 – December 2013)*

In May 2013, the social worker reported that Mother "appears to be making every effort to complete the [Whiteside Manor dual diagnosis] program . . . ." Mother was consistent with visitation and helped D.J. with his homework.

DPSS placed D.J. with the paternal grandfather on June 7, 2013.

On August 2, 2013, D.J. told a social worker that he "is happy living with [the paternal grandfather] and he has had a good summer." He described his visits with Mother as "'[g]ood.'"

In October 2013, the social worker reported that Mother was "living at the clean and sober living environment" and "is learning to remain sober." Mother understood that she must limit her visits with D.J. to once per month. During her visits, she helped D.J. with learning the alphabet, colors, and writing his name.

The social worker also reported that the paternal grandfather "continues to provide a home [for D.J.] free from drugs and domestic violence," and that the two "have a very strong bond . . . ." The paternal grandfather "wants only the best for [D.J.] and is giving the child a stable home life." In a preliminary assessment regarding the paternal grandfather as a prospective adoptive parent, the social worker stated that "[t]here will be postadoption contact" between D.J. and Mother.

9

In November 2013, a social worker spoke with D.J. about adoption. (D.J. was almost six years old by this time.) According to the social worker, D.J. "agreed with the plan of adoption" and said he "enjoys living with his paternal grandfather in his home [and] wants to stay with his grandfather and not anyone else." The following month, the social worker reported that D.J. "has made the adjustment to living with his paternal grandfather"; he has become "very attached to his paternal grandfather" and the relationship between the two "is strong."

Regarding Mother, the social worker noted that she "continues living in a clean and sober home. She is still new to her sobriety. She has found employment and is working." The social worker opined that it "would be detrimental if [D.J.] was returned to his [M]other or father" and that the "prognosis for reunification is poor."

G. *Section 388 Petition and Section 366.26 Hearing (December 2013)*

On the date of the section 366.26 hearing, Mother filed her section 388 petition. Mother requested that the court vacate the section 366.26 hearing and place D.J. with her on family maintenance status or, alternatively, that she be provided with family reunification services. In support of the petition, Mother included a letter from a representative of Whiteside Manor stating that Mother had completed certain phases of treatment and had moved into an independent living program. The representative further stated that Mother had complied with the program's rules and actively sought support "to help ensure a life of sobriety for her and potentially her son if given the opportunity to have her parental rights reinstated." The court ordered a hearing on the petition.

10

The hearings on the section 388 petition and the section 366.26 issues took place on December 17, 2013. Mother testified that she completed a 90-day, inpatient substance abuse program at MFI; after completing that program, she "relapsed," and D.J. was removed from her care and she was provided additional services and entered a second substance abuse program; in October 2012, she had a second relapse; she then underwent a seven-day detoxification program and entered Whiteside Manor; she completed the Whiteside Manor program and entered the Whiteside Independent Living program, where she now resides in a sober living home. She has a sponsor and a part-time job. When asked when she would be able to get her own residence, she said "it's going to take a while."

Mother said she is currently "stable on medications" and seeing a therapist. She is staying away from former friends who were a negative influence on her, and has been "clean" since January 11, 2013 (i.e., more than 11 months).

Mother further testified that she sees D.J. every weekend and is aware of how he is doing "[m]edically, physically, educationally, everything." D.J. calls her "Mom." She believed that adoption would not be in D.J.'s best interests because, as she stated, "it would be traumatic for him to lose me, and I think that I'm capable and I have the opportunity now to know right from wrong. And I am involved in his education, and I've learned from my mistakes." She added: "I'm able to give to him what I wasn't able to give to him in the past. And that's love, support. I'm stable. I can provide welfare to him." She also spoke favorably of the paternal grandfather's support for her and believed

11

that he would continue to support her in her "efforts to remain sober and be a mother figure to [D.J.]."

Following argument by counsel, the court commended Mother for the "great strides" she had made, and acknowledged that "[i]t's not easy to get sober or to handle issues that come up." Nevertheless, the court denied the section 388 petition, explaining that "[M]other's circumstances are changing, not yet fully changed" and that granting the petition was not in D.J.'s best interest because "he is very stable in his current placement . . . ."

Regarding the section 366.26 issues, Mother's counsel argued that the "parent/child bond exception" to adoption applied in this case. Counsel for DPSS disagreed, and argued that the benefits of adoption "far exceed" any detriment D.J. might suffer from terminating parental rights. D.J.'s counsel argued that D.J. "would like to stay with his grandfather. He does enjoy his [M]other's visitation and loves his [M]other," but "the greater stability comes from the fact he's with his grandfather."

The court found that D.J. was likely to be adopted, adoption was in D.J.'s best interest, and none of the statutory exceptions to adoption applied. The court then terminated the parents' parental rights.

### III.  DISCUSSION

A.  *Section 388 Petition*

Section 388 allows the parent of a dependent child to petition the juvenile court to change, modify, or set aside a previous order of the court. Under the statute, the parent

12

has the burden of establishing by a preponderance of the evidence that (1) there is new evidence or changed circumstances justifying the proposed change of order, and (2) the change would promote the best interest of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; § 388, subds. (a), (b).) The decision to grant or deny the petition is addressed to the sound discretion of the juvenile court, and its denial of the petition will not be overturned on appeal unless an abuse of discretion is shown. (*In re S.J.* (2008) 167 Cal.App.4th 953, 959-960 [Fourth Dist., Div. Two].)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.]" (*In re Stephanie M., supra,* 7 Cal.4th at p. 317, quoting *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Still, "[s]ection 388 plays a critical role in the dependency scheme. Even after family reunification services are terminated and the focus has shifted from returning the child to his parent's custody, section 388 serves as an 'escape mechanism' to ensure that new evidence may be considered before the actual, final termination of parental rights. [Citation.] It 'provides a means for the court to address a legitimate change of circumstances' and affords a parent her final opportunity to reinstate reunification services before the issue of custody is finally resolved." (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1506.)

13

The court's findings in this case are supported by the record and its conclusion is not an abuse of discretion. Mother had been using drugs, in her words, "'off an[d] on' over the years." This indicates a long history of using drugs, then not using drugs, and relapsing. Shortly before this dependency case began, Mother had been sober for two years before relapsing. After the case began, she completed an inpatient program at MFI, then relapsed three months later. One year later, in May 2012, she completed an inpatient program at A Woman's Place, then relapsed again, testing positive for amphetamines in October and November 2012. At the time of the hearing on the section 388 petition, Mother had completed the "primary phase" and "Transition Phase" of treatment at Whiteside Manor and had moved to the "Independent Living Program phase of treatment." According to the letter from Whiteside Manor submitted in support of Mother's petition, in this third phase Mother "will be required to submit to drug testing, daily monitoring, medication/psychiatric management, and building of independent living skills with weekly counseling sessions."

Mother's achievements so far in the Whiteside Manor programs are, as the trial court noted, commendable. However, the court could also reasonably conclude that her current sobriety while under Whiteside Manor's oversight does not ensure a relapse-free future. Although she had been sober for the 11 months preceding the hearing date, she had also recently been sober for a two-year period before relapsing. Because of her long history of substance abuse and repeated relapses, the court's conclusion that Mother's

14

conditions were "changing, not yet fully changed," is reasonable and not an abuse of discretion.

Mother relies on the following facts to support her argument: Her effort to seek and resume treatment following relapses shows her commitment to changing her life; she has benefitted from her counseling programs; the positive drug tests in 2011 and 2012 "were only a handful" compared with the number of negative tests; her "sporadic and brief periods of drug use" did not harm D.J.; she has been sober since January 11, 2013, and has eliminated the friends who were a "bad influence" on her; a change in her medication has made a positive difference; the Whiteside Manor letter supports her claim; and she has a job. These facts were before the trial court and undoubtedly influenced the court's statement that Mother had made "great strides" in the preceding year. They do not, however, compel us to conclude that the court's finding of changing, but not changed, circumstances was unreasonable.

We further conclude that the court's determination as to D.J.'s "best interests" is not an abuse of discretion. Mother's section 388 petition was presented on the day of the section 366.26 hearing. At that time, this case was more than three years old, D.J. had just turned six, and he had been out of Mother's care for more than one year. At this late point in the dependency proceeding, "the child's interest in stability is the court's foremost concern, outweighing the parent's interest in reunification." (*In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1348; see also *In re Anthony W.* (2001) 87 Cal.App.4th 246, 251.)

15

D.J.'s prospective adoptive parent, his paternal grandfather, has known D.J. since D.J.'s birth and they have had a "close relationship" for the last five years. The paternal grandfather is now able to devote his "full attention" to D.J. and has made D.J. his "first priority." D.J. had been placed with the paternal grandfather six months before the hearing on the section 388 petition with a view to adoption. D.J. thereafter "made the adjustment to living with his paternal grandfather" and became "very attached to his paternal grandfather." In the preliminary assessment of the paternal grandfather as the prospective adoptive parent, social workers noted that D.J. "was observed to have a strong bonded relationship to the prospective adoptive father" and "observed to go to him for love, assurance and guidance." D.J. agreed with the plan of adoption and told the social worker he "wants to stay with his grandfather and not anyone else."

Mother acknowledges the close relationship D.J. has with the paternal grandfather, but asserts that he has an "equally-strong emotional tie to [her]." D.J., she argues, lived with Mother for the majority of his life and "shared a loving and positive relationship with her since birth." Mother, however, was still participating in the Whiteside Manor independent living program and, in her words, it was "going to take a while" before she would be able to get her own residence. The permanency and stability that would benefit D.J., therefore, would have to wait. Thus, even if we accept Mother's assertion that D.J.'s relationship with the paternal grandfather and Mother are "equally-strong," the trial court could reasonably conclude that D.J.'s best interests were served by denying

16

Mother's section 388 petition. The court's ruling was, therefore, not an abuse of discretion.

B. *Parental Benefit Exception to Adoption*

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Permanent plans include adoption, guardianship, and long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)

Adoption involves terminating the legal or parental rights of the child's natural parents. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 574.) In order to avoid termination of parental rights and adoption, a parent has the burden of showing that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) The exceptions permit the court, "in *exceptional circumstances*," "to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

The so-called parental benefit exception applies when there is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child due to . . . the following circumstances: [¶] . . . The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "Benefit," for this purpose, means that

17

"the well-being of the child [is promoted] to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

We apply the substantial evidence standard of review to factual issues, such as the existence of a beneficial parental relationship, and the abuse of discretion standard to the discretionary determination of whether there is a compelling reason for finding that termination would be detrimental to the child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 530-531; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) The analysis under either standard of review is essentially the same under both standards. As one court explained: "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that . . . no judge could reasonably have made the order that he did.' . . .'" [Citations.]" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

Here, there is no dispute that Mother satisfied the threshold requirement of the parental benefit exception—she maintained regular visits and contact with D.J. We can

18

also assume for purposes of our analysis that Mother and D.J. had a beneficial parent-child relationship. Mother did not, however, establish that D.J. "would be greatly harmed" by terminating Mother's parental rights. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1235.)

There is nothing in any of the social workers' reports to suggest that D.J. would suffer great harm as a result of proceeding with adoption and terminating Mother's parental rights. Indeed, there is ample support for the contrary conclusion. The paternal grandfather, as the prospective adoptive parent, could provide not only the stability and permanency for D.J. that comes with adoption, but also "a home free from drugs and domestic violence." Social workers reported that D.J. and the paternal grandfather have a "strong" and "special" relationship, that D.J. has adjusted to living with the paternal grandfather, and that D.J. "wants to stay with his grandfather and not anyone else."

The only evidence that D.J. would suffer any detriment as a result of terminating parental rights is Mother's testimony that "it would be traumatic for [D.J.] to lose [her]." The court could, however, reject Mother's opinion on this point or consider it outweighed by the evidence pointing to the benefits of adoption and the absence of detriment resulting from the termination of parental rights.

Mother relies on *In re S.B., supra,* 164 Cal.App.4th 289 and *In re Amber M.* (2002) 103 Cal.App.4th 681. Both are distinguishable. In *In re S.B.*, a bonding study described the bond between the child and parent as "'fairly strong' or 'moderate.'" (*In re S.B., supra,* at p. 295.) "During the study, S.B. sat in [the father's] lap, played games and

colored. [The father] was responsive to her requests. In the middle of coloring, S.B. said to [the father], 'I love you,' and he responded in kind. S.B. whispered and joked with [the father] and then spontaneously said, 'I wish I lived with you and Mommy and Nana.'" (*Ibid.*) At the hearing, the author testified that "because the bond between [the father] and S.B. was fairly strong, there was a potential for harm to S.B. were she to lose the parent-child relationship." (*Id.* at p. 296.) The trial court found that the beneficial relationship exception did not apply and the Court of Appeal reversed. (*Id.* at p. 301.)

In explaining the reasons for reversing the trial court, the *In re S.B.* court stated: "For the first year after she was removed from parental custody, S.B. continued to display a strong attachment to [the father]. She was unhappy when visits ended and tried to leave with [the father] when the visits were over. [The father] was sensitive to S.B.'s needs. Social worker Brown noted, '[the father] consistently puts his daughter[']s needs and safety before his own.' S.B. responded to [the father's] attention. During one visit, S.B. 'sat on [the father's] lap . . . [and] proudly showed off the pink tennis shoes he had bought her.' The record clearly establishes S.B. initiated physical contact with [the father]. Dr. Kelin observed that S.B. 'ran into [the father's] arms, again getting her father to pick her up.' [The father] and S.B. shared an affectionate relationship. S.B. 'nestle[d] up to [the father's] neck' and 'whispered and joked with him.' The record also shows S.B. loved [the father] and wanted their relationship to continue. S.B. whispered to her father, 'I love you.' As [the father] started to leave, S.B. stated, 'I'll miss you,' and then she gave him another hug. S.B. spontaneously said, 'I wish I lived with you and Mommy

20

and Nana.'"" (*In re S.B., supra,* 164 Cal.App.4th at p. 298.) The court concluded: "The record shows S.B. loved her father, wanted their relationship to continue and derived some measure of benefit from his visits. Based on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [the father]." (*Id.* at pp. 300-301.)

The present case is distinguishable from *In re S.B.* The child's clear desire to live with the parent in that case is not present here. Although D.J. described visits with Mother as "good," there is little evidence that he shared the kind of affection for Mother that the child expressed for her father in *In re S.B.* More importantly, in contrast to S.B.'s expressed desire to live with her father, D.J. indicated to the social worker that he agreed with the plan for adoption and wanted to live with the paternal grandfather. Because of the factual differences between this case and *In re S.B.*, that case is not controlling here.

In *In re Amber M.*, there was evidence by a psychologist that the mother and the dependent child "shared 'a primary attachment' and a 'primary maternal relationship' and that '[i]t could be detrimental' to sever that relationship." (*In re Amber M., supra,* 103 Cal.App.4th at p. 689.) Here, there was no similar expert evidence and, as set forth above, ample contrary evidence. Accordingly, it is distinguishable from this case.

For the foregoing reasons, and based on our review of the entire record, we conclude that the court did not abuse its discretion in determining that the parental benefit exception to adoption did not apply in this case

21

## IV.  DISPOSITION

The orders appealed from are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
_____
J.

We concur:

McKINSTER_____
Acting P. J.

CODRINGTON_____
J.